## The Lykens Valley Coal Company *versus* Dock, Assignee, &c.

1. L. leased coal-mines to F., to have "the right to mine, carry away and dispose of" coal. F. having mined coal, which remained in the mine just as it fell from the breast, made an assignment for creditors. *Held*, that the coal was personal property and passed to the assignee, and trover would lie for it against L. preventing its removal, provided its removal did not essentially injure the mine.

2. If the coal could not be removed without material injury to L., F.'s right of property was not complete and final, because of his obligation to mine in the most approved method, and leave the mines in good order.

3. As to damages, the court charged, "You allow, not for the expense of mining, but for the coal as mined lying in the run. This includes the value of the coal itself, what might be called 'coal-leave;' for, although not paid for, it belongs to the tenant." *Held*, under the circumstances, not to be error.

4. Rent due by F. could not be deducted from damages in trover.

5. The rent was wholly disconnected from the taking of the coal, and its deduction would be set off, which cannot be made in trover.

6. Herdic *v.* Young, 5 P. F. Smith, explained.

7. A railroad was laid in the mines for moving coal to the breaker; F.'s assignee had the right to use it to remove the coal.

May 17th 1869. Before THOMPSON, C. J., AGNEW, SHARSWOOD and WILLIAMS, JJ. READ, J., absent.

Error to the Court of Common Pleas of *Dauphin county:* No 9, to May Term 1869.

This was an action of trover by Gilliard Dock, assignee for the benefit of creditors of The Franklin Coal Company, against The Lykens Valley Coal Company. The writ was issued to November Term 1866. On the 1st of February 1865 The Lykens Valley Coal Company leased to The Franklin Coal Company the coal-lands, houses, improvements, together with the breaker and machinery belonging to the lessors, the lease to continue for 50 years. By the 3d section the lessees are to have the right to mine and carry away and dispose of coal they may mine from the land leased ; the lessees to pay $45,000 per annum, monthly, for the first six years in advance, with an increased rent thereafter as set out in the lease : and in addition for each ton of coal mined over 150,000 tons in each year a royalty of 30 cents per ton; the rent to be paid " without deduction arising from any defect or fault in the coal veins, or from any other cause, matter, or thing whatever."

"The lessees to make, procure, and set up, at their own expense, all necessary improvements for developing said coal-lands, and mining the coal thereon, to keep the breaker, slope-house, tenant-houses, wharves, and shutes at Millersburg, together with the engines, chains, and all the machinery of the breaker, and in the slope-house in good order, repair and condition during this lease, and deliver up the same at the expiration thereof in like good order and repair, reasonable wear and tear only excepted ; they are also to manage and conduct the mines and the mining of coal, as also the sinking of any new slopes or lifts in the present or any other slopes hereafter opened, or opening or driving any tunnel or gang-ways in the most approved method of modern mining with due regard to ventilation, drainage and propping, and to deliver up the said mines, as well those now opened as those hereafter to be opened by them in good order and condition at any termination of this lease, reasonable wear and tear only excepted."  *  *  *

By section 9th all the rolling stock, cars, loose tools and other personal property, are to be taken as part of the lease, an inventory of these articles being annexed to it, the lessees at their own expense to keep these articles in repair and substitute others of equal value when any are injured or destroyed, and the original articles and those substituted to be the property of the lessors, who may take possession of them in case any part of the rent should be unpaid when due, and if " the lessees, their successors or assigns," should attempt to remove this property from Dauphin county, or if any judgment should be recovered or attachment issued against the lessees, &c., under which their interest in the personal property should be seized or attempted to be seized, &c., the lease of the personal property shall be terminated and the lessors may at once take possession of it, and enter upon the leased lands for that purpose. The lease was not to be assigned

except by consent of the lessors. By the 14th section of the article it was agreed "that all improvements made by said lessees, their successors or assigns, to the present works of said company, and the machinery thereof, and every breaker, slope-house, engine and machinery and buildings, or improvements whatever, now erected or hereafter to be erected by said lessees, their successors or assigns, on the property hereby leased, shall be deemed and considered the property of said lessors, &c., and shall at the termination of this lease, from any cause whatever, &c., enure to the benefit of said lessors, &c., and shall be deemed, taken and considered as the property of said lessors, &c., without any compensation whatever therefor, to said lessees, their successors or assigns."

By the 15th section it was provided that if the rent remained due for thirty days the lessors might take possession of the premises, and if the lessees refuse to deliver possession, the lessors might bring an action of ejectment, and the lessees, by the same section, gave a warrant to confess judgment in the action of ejectment.

On the 3d of August 1866 the lessees made an assignment for the benefit of creditors to Dock the plaintiff. The lessors afterwards entered and took possession of the personal property claimed by them. There was quite a number of articles, amongst which were a turning-lathe, and (as the jury found), 8000 tons of coal. There was evidence as to the character of the ownership and possession of the articles claimed, and also of the different methods of mining; whether by "the run" or by wagon, and the cost respectively; that when working by "the run" the coal came out more in a solid mass with dirt and stone which required separation; that removing what was in "the runs" would leave the upper part of the vein inaccessible; the mining here appeared to have been by "the run." The assignee claimed the articles of Savage the superintendent of the lessors, who informed the assignee that he had received orders not to permit anything to be taken from the premises; Hoffman, the president of the defendants, notified the assignee that he would resist the removal of the coal; he said it would injure the mines to remove it, and denied the assignee's ownership; he claimed it for rent unpaid. The assignee asked the president if he could not take the coal out, the president replied that he could not have the use of the gangway to take it out.

These mines were afterwards worked by Edward Savage, who testified that by his contract with the defendants he was to have all the mined coal, and that he took away twenty-seven loads. There was evidence of the value of the coal and the other articles; as to this and the cost and proper method of mining, and as

to the injury to the mines by the running the coal, the evidence was conflicting.

Pearson, P. J., after preliminary remarks on the form of action and the evidence, charged, * * "Until the coal is mined it remains real estate. As soon as severed it becomes personal property, although not removed from the runs. * * There were many of these runs, and generally full of the mined coal, which was to be removed from the lower end, next the gangway, and would come down to the opening by its own weight, the angle of descent being quite steep. At the time the mining ceased they had not reached the open end of the mine with any of the runs, and it would seem that the coal had been left in the runs the better to enable the laborers to mine the remainder. [We have no hesitation in saying that this mined coal in the runs was personal property, could have been removed by the tenant, and passed by the general assignment to Mr. Dock, who had the right to remove it notwithstanding the re-entry by the landlord—the Lykens Valley Company—provided it could be done without essentially injuring the mines.] The right to mine and remove the coal is secured in terms by the third article of the contract, but independently of this provision, it would exist from the general terms of the lease. You have heard the opinion of the witnesses as to the facility and difficulty of mining the residue of the coal after this is removed from the runs: some express the opinion that it could be readily done, and point out the means; others that it could not be mined without great expense and risk. You must judge between them. You are instructed that if this coal could be removed without doing material injury, the Lykens Valley Company was bound to permit the assignee to remove it. If the injury would be essential, rendering it impossible or very difficult and dangerous to take out the residue of the coal, the company—the owner of the mines—could lawfully forbid its removal, at least for the time being, and until the residue could be worked out. Such refusal to permit the coal to be removed would not be a conversion. If it would not essentially injure the mines to remove the coal in the runs, the refusal by the president of the company, and those having charge of the mines to permit it to be done, would be evidence of a conversion. That subject will be next explained. It is contended by the defendant's counsel that there is no evidence in this case from which the jury can find a conversion of the property sued for. A demand by the owner of personal property for its delivery, made on the person having it in possession, and a refusal by him so to do, is evidence of conversion—matter from which the jury should infer it, unless some legal reason is given for the non-delivery. It is not of itself a conversion. But an actual conversion of the goods is sufficient, without proof of a demand; as by using, consuming or selling them. Mr. Dock testifies that after the

assignment to him, he demanded the goods now claimed from Mr. Hoffman, president of the Lykens Valley Coal Company. * * We have already fully instructed you as to the right of the Lykens Valley Company, to retain the coal in case the removal would seriously injure the mines. We are unable to see from any evidence in the case that it was owned by the defendant, or that it possessed the right of retention on any other grounds than the danger of injury. It had taken no measures to distrain it for rent."

After referring to the evidence on the question of conversion, the judge proceeded :—

["In addition to this, Mr. Edward Savage testifies that on leasing the mines, the Lykens Valley Company sold him all of this coal in the runs—he removed a portion and had liberty to remove all. The sale of the goods of another person is strong evidence of conversion by the *vendor*. On the whole, we decline to charge you as requested, that there is no sufficient proof of a conversion of any of these goods by the defendant, but on the contrary we think that there is strong evidence of conversion, and such from which you may properly infer it, if you believe the witnesses.]

["We are also asked to instruct you that trover is not the proper remedy in this case, but the Franklin Coal Company or its assignees must bring an action on the contract. Trover is the common and very proper remedy by an assignee in bankruptcy or insolvency to recover the goods belonging to his assignor, the bankrupt. In such action there can be no set-off. This is right, as the assignee sues for the benefit of creditors, and to carry out the trust. Were he to sue on the contract, the general indebtedness of the Franklin Company to the Lykens Valley Company could be set off, which would be improper as to the creditors, whom the company making the assignment had the right to prefer under our laws. We decline to charge as requested, but say that the assignee can support this form of action—need not sue on the contract.]

"If on the principles stated and the facts submitted, you find a verdict in favor of the plaintiff, the next question is as to the measure of damages. This, in an action of trover, is generally the actual cash value of the property at the time of the conversion, to which may be added interest from that period until time of trial. The giving of interest is measurably optional with the jury under all the circumstances. It may be and often is in hard cases refused." * *

["You allow not for the expense of mining, but for the coal as mined, lying in the run. This includes the value of the coal itself—what might be called 'coal-leave,' for although not paid for, it belongs to the tenant. This may seem hard, but is no

more so than every other case where goods are sold and delivered. to a bankrupt whose assignee will take them in preference to the vendor, who has delivered them without payment; should they be returned by the purchaser to "the vendor, the assignee can recover their value in trover.]

["Hoffman (the president of the Lykens Valley Company), refused the use of their underground road, their cars, &c., to remove the coal. We are of the opinion that under the contract and the circumstances so far as developed, the Franklin Company was entitled to the use of the roadway to remove the coal from the mines, such right would not, however, give it or its assignee the right to use the cars of the company to remove or their breaker to prepare the coal. We are of the opinion that he had a right to use the general railroad within the lines for that purpose, provided the business was so conducted as not materially to interrupt the other company in its business.] How the Lykens Valley Company acquired possession of the mines is not in proof. It is quite probable that its agents re-entered on the failure of the Franklin Company; but such re-entry would not give it the right to the personal property of the latter company found on the ground, and previously assigned to Mr. Dock for the use of the creditors."

The verdict was for the plaintiffs for $6875.36. The jury returned with their verdict this paper, which was filed:—

" We find for the plaintiff as follows:—

| | |
|---|---:|
| 2 pieces of best chain | $10.00 |
| 1 small piston | 5.00 |
| 2 brass packing rings, 18 inches in diameter | 35.00 |
| 2 " " " 16 " " " | 30.00 |
| 6 brass valves | 10.00 |
| ½ of turning lathe and tools | 150.00 |
| 1 lot of screen bars | 20.00 |
| 1 stove | 12.00 |
| 101 feet of log pipe | 25.25 |
| 8000 tons of coal | 6000.00 |
| Interest from Sept. 15th 1866 to March 27th 1868 | 579.41 |
| | $6876.66" |

The defendants removed the case to the Supreme Court, and assigned for error the portions of the charge included in brackets.

*R. A. Lamberton*, for plaintiffs in error.—Detaching the coal from the solid bed did not, *ipso facto*, make it personal property; the assignor could not have removed it, and the assignee was in no better position: Twelves v. Williams, 3 Wharton 485; Vandyke v. Christ, 7 W. & S. 373; Ludwig v. Highley, 5 Barr 137; Rogers v. Gillinger, 6 Casey 187. A tenant may remove fixtures: Hill on Real Prop. 67; 2 Kent's Com. 343; Whiting v. Brastow,

4 Pick. 310. Although demand and refusal be evidence of conversion, yet when there is no actual conversion, trover will not lie: Wilbraham *v.* Snow, 2 Saund. 47, e. note; Mires *v.* Solebay, 2 Mod. 244; Buller's N. P. 44; 2 Leigh's N. P. 1485; Bacon's Ab. " Trover " 681; Isaac *v.* Clark, 2 Bulstrode 310; Mather *v.* Trinity Ch., 3 S. & R. 515; Lyon *v.* Gormley, 3 P. F. Smith 265; Forsyth *v.* Wells, 5 Wright 294; Wright *v.* Guier, 9 Watts 172; Sanderson *v.* Haverstick, 8 Barr 294; Stafford *v.* Ames, 9 Id. 343; Backenstoss *v.* Stahler, 9 Casey 251. The action should have been on the contract: 1 Chitty's Pl. 97. The value of the coal in place should have been deducted from the whole value of the coal as it lay: Lyon *v.* Gormley, *supra;* Herdic *v.* Young, 5 P. F. Smith 178.

*J. H. Briggs, Hamilton* and *L. B. Alricks,* for defendant in error.—Trover was the proper form of action: Lyon *v.* Gormley, Forsyth *v.* Wells, *supra.* Sale is evidence of conversion: 2 Saunders Pl. & Ev. 882. An agent is liable in trover though acting by the principal's order: Perkins *v.* Smith, 1 Wilson 328; Stevens *v.* Elwell, 4 M. & S. 529; 2 Greenleaf Ev., sect. 642; 1 Chitty's Pl. 176. Trover lies notwithstanding the lease: 2 Saunders Pl. & Ev. 870, 877.

The opinion of the court was delivered, July 6th 1869, by
AGNEW, J.—There was no error in the court, charging that the mined coal was personal property, passing under the assignment for the benefit of creditors, and subject to be removed by the assignee; qualified as the instruction was that this could be done without essentially injuring the mines. The very purpose of the lease, expressed in terms, was to enable the Franklin Company to mine, carry away, and dispose of the coal. The separation of the coal lying in the runs from the mass of coal in place, was the result of a large expenditure of money and labor in the preparation for mining, and also in the mining of it. It was no longer a part of the coal in place, but lay in the breasts ready for transportation. It would be unjust if, after the tenant had done all this, the mined coal were still to be treated as a part of the realty; except so far as it would be necessary to carry out the covenants in the lease. If the coal could not be removed without material injury to the lessor, we would have to assume that the tenant's right of property was not complete and final, because of the covenant (in this instance expressed) to manage and conduct the mines and the mining of coal in the most approved method of modern mining; and to leave the mines in good order and condition at *any* termination of the lease. On the question of proper mining much evidence was given and different opinions expressed. The court

· [Lykens Valley Coal Co. *v.* Dock.]

fairly submitted to the jury the question of fact, whether the mined coal could be removed without material detriment to the mines.

It does not appear that the judge misstated the testimony of Edward Savage, in charging on the question of conversion. It is true Savage says he preferred mining the coal for himself to taking the coal there for nothing. In his opinion the coal in the runs could not be prepared for market without injuring the reputation of the mines. But on the point of sale by the defendants of the mined coal, which was the material one in regard to the conversion, he does say first in chief (p. 35) he had the right to remove it; and then in cross-examination, that the company gave us permission to take all there, solid and *mined* coal,—that is my construction *of our contract.* They did not object to our taking what we took,—twenty-seven loads,—we were to have all the *mined* coal there.

The conversion being established—and the jury have found this fact on evidence sufficient to be submitted to them—trover was the proper form of action. The coal being found to be the property of the plaintiff upon sufficient evidence and proper instructions, and the conversion by the defendants and their refusal to permit the assignee to carry it away, the right of action in this form is complete.

In allowing the jury to find for the plaintiff the actual value of the coal as it lay in the breasts, and not the cost of mining, assimilating it to the value of coal-leave, as it is known, the court did the defendants no injustice. This was clearly the lowest form in the expression of value that could be given to it. It gave the defendants all the advantage of the mined coal without the expense and labor of superintending its mining. The right to a deduction from this value, of rent unpaid, cannot be conceded in this form of action. There is a plain distinction in measuring damages between property rightfully acquired, and that taken wrongfully. The latter was the case in Herdic *v.* Young, 5 P. F. Smith 178, cited in the argument. The doctrine held there was that in the case of an inadvertent trespass, where no damages ought to be allowed beyond compensation for any outrage in the taking, it would not be just that the owner should be allowed the value added to the article by the labor and expense of the trespasser, beyond a proper compensation for the value of the thing when the trespass was committed. There just compensation required a reduction from the superadded value, so as to bring the damages nearer to the true standard of loss suffered by the plaintiff. But here there was no trespass inadvertent, or wilful, but a rightful reduction to the possession of the Franklin Company by virtue of the lease, as its own property. There was no wrong in the taking to be compensated for, and no right of reduction in the value growing out of the state

of the property itself. The rent which the defendants asked to be used in the reduction of the value of the coal was an independent demand wholly disconnected from the taking of the coal. Its deduction would be on the principle of a simple set-off, and not an equitable defalcation from the gross value. Such a set-off cannot be made in trover.

We think the court charged correctly also as to the right to use the railroad in the mines to remove the coal, qualified by the instruction that the use should be such as not to interrupt the defendants in the use of the mine. To have held otherwise would be simply to say that the mined coal could be used by no one. It being the property of the plaintiff the defendants would be liable if they converted it, and if the plaintiff entered to take it, he would be a trespasser. This would be unreasonable and inconsistent with the purpose and terms of the lease. *Lex non patitur absurdum.* The coal being lawfully mined the lessees had a right to remove it by the terms of the lease, and through the means and appliances sanctioned by its terms. The lease did not expire by efflux of time, so as to warn the lessees not to leave their work unfinished. If the defendants regained possession of the mines rightfully, a fact not clearly appearing in the evidence, yet a reasonable construction must be placed upon such a right of entry, that it should not be used as a penalty to forfeit all rights acquired before the entry. The property in the mined coal having already vested under the lease, the means of taking it away provided in the lease, which gave the possession and use of the mines and all their fixtures, machinery and appliances, must be construed to remain a sufficient reasonable time to enable the lessees to remove their property. The means reserved by the lessors in this lease to recover possession on the breach of certain covenants, are exceedingly sharp, stringent and speedy. They are not to be permitted to be used to destroy all the lessee's rights of property, disconnected as they may be with the particular breach which was enforced by re-entry. This is not a case of option, where the removal could be effected by other means. The railroad is the only available means of ingress and egress to remove the coal, and necessity requires its use. *Necessitas facit licitum quod alias non est licitum. Necessitas quod cogit defendit.* An equitable and reasonable interpretation must therefore be given to the terms of the lease. *Lex aliquando sequitur æquitatem.*

                                        Judgment affirmed.